IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Cr. No. 22-20138 - SHL |
| | ) | |
| vs. | ) | 18 U.S.C. § 242 |
| | ) | |
| BRIDGES RANDLE, JR. | ) | |
| a/k/a AJAMU ABIOLA BANJOKO | ) | |
| a/k/a OLUWAFEMI ABIOLA BANJOKO | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UNITED STATES' TRIAL BRIEF

Comes now the United States of America (hereinafter "the Government"), by and through undersigned counsel, and submits this trial brief to aid the Court in the trial of this matter, scheduled to begin February 21, 2023.

### I. INDICTMENT

On June 9, 2022, a federal grand jury returned an indictment charging the Defendant with sexually assaulting a woman, K.T., while he was on duty as a Memphis Police Department officer responding to a 911 call to her residence on June 24, 2000. (Doc. 4). Specifically, the indictment charges the Defendant with violating 18 U.S.C. § 242 for depriving K.R. of her constitutional right to liberty without due process of law, which includes the right to bodily integrity. *Id.* The indictment further alleges that this act involved aggravated sexual abuse. *Id.* This matter is set for trial on February 21, 2023. (Doc. 30).

1

## II. SUMMARY OF THE EVIDENCE

The Government anticipates presenting the following evidence at trial through a combination of (1) testimony from the victim, K.T.; (2) testimony from multiple outcry witnesses who spoke with K.T. following the assault; (3) reports by and testimony from medical staff regarding the assault; (4) expert testimony regarding DNA analysis; (5) MPD reports and records; and (6) testimony regarding the Defendant's sexual assault of a second woman, N.J., a year after the sexual assault charged in this case.[1]

On June 24, 2000, twenty-four-year-old K.T. (the victim) called the Memphis Police Department to report that her boyfriend vandalized her car. MPD officers, including the Defendant, arrived at her home. The officers took K.T.'s statement and the Defendant stated that he would need to return to take photographs of the damage to K.T.'s car. The officers left, and K.T. went to bed. K.T. was awakened by a knock at her front door. She looked through the peephole in her door and recognized the Defendant as the same officer who had been to her house earlier. The Defendant told K.T. he had returned to take photographs of the damage to her car, and K.T. let the Defendant into her apartment. The Defendant sat next to K.T. on a couch in her apartment. K.T.'s two-year-old daughter was asleep nearby. The Defendant told K.T. that she was beautiful, which made K.T. uncomfortable. When K.T. asked the Defendant to leave, the Defendant told her she did not want anything to happen to her daughter, pulled out his gun, and dragged her to her daughter's bedroom.

---

[1] The United States filed a motion seeking admission of testimony and evidence regarding the Defendant's sexual assault of N.J. pursuant to Federal Rule Evidence (FRE) 413. (Doc. 50). The facts are described in more detail in that motion, but in short, on July 18, 2001, the Defendant reportedly sexually assaulted another woman, N.J., while on-duty as a Memphis police officer. *Id.* at 3–4. In that case, N.J. reported the Defendant to police. The Defendant later pled guilty to a felony charge of official oppression and received a one-year probationary sentence. *Id.* at 4.

As the Defendant dragged K.T. down the hall, K.T. grabbed a doorframe to try to stop the Defendant from pulling her. The Defendant overpowered her, causing K.T. to hit the left side of her head on the door frame and causing bruising to K.T.'s arm and knee.

The Defendant pulled K.T. into her daughter's bedroom and pushed her onto the bed. K.T. held her hands up against the Defendant's chest, attempting to stop him. Throughout the sexual assault, the Defendant pressed his gun on K.T.'s chest with the barrel pointing toward K.T.'s chin, causing K.T. to fear he might kill her. The Defendant eventually pried K.T.'s legs apart with his knees as K.T. tried to keep her legs closed. The Defendant then penetrated her vagina with his penis; he did not use a condom. K.T. kept telling the Defendant to stop, but he did not stop. The Defendant eventually finished and left.

Shortly after the Defendant left, K.T. called several friends and her mother, and reported the sexual assault to them.[2] K.T. went to the hospital and then the Rape Crisis Center, where she received medical treatment. She made multiple statements to medical staff[3] and MPD officers in the hours following the assault, including giving a detailed description of both the sexual assault and the officer who assaulted her. K.T. also submitted to a sexual assault kit. Despite K.T.'s statements and the sexual assault kit, MPD conducted no additional investigation into K.T.'s assault until her sexual assault kit was finally tested in 2013.[4] The Government intends to present

---

[2] The Government filed a motion *in limine* seeking admission of K.T.'s outcry statements pursuant to FRE 801(d)(1)(B) (prior consistent statements) and 803(2) (excited utterances). *See* Doc. 48.

[3] The Government filed a motion *in limine* seeking admission of K.T.'s medical records pursuant to FRE 803(6) and K.T.'s statements to medical professionals pursuant to FRE 803(4). *See* Doc. 48.

[4] The Defendant was charged with aggravated rape by the Shelby County District Attorney's Office in connection with his sexual assault of K.T. Following trial, he was acquitted on March 29, 2018. *See State of Tennessee v. Randle*, No. 14-03097 (Crim. Ct. Tn. 30th Dist. 2018). The Government filed a motion *in limine* seeking exclusion of any reference to the result of the state

the expert testimony of former Tennessee Bureau of Investigation (TBI) Special Agent/Forensic Scientist Samantha Spencer regarding the examination of K.T.'s sexual assault kit, as set forth in more detail in the Government's expert notices (Docs. 42 & 43). Ms. Spencer will testify that the Defendant's DNA profile was identified on the vaginal swabs from K.T.'s sexual assault kit.

### III. THE ELEMENTS OF THE CHARGED OFFENSE AND LEGAL ANALYSIS

The indictment charges the Defendant with violating K.T.'s constitutional rights while acting under color of law by sexually assaulting her. To establish a violation of 18 U.S.C. § 242, the Government must prove (1) that the defendant acted under color of law; (2) that the defendant deprived the victim of a federally protected right; and (3) that the defendant acted willfully. To establish a felony violation, the Government must also prove that an aggravating factor existed, such as the crime involved aggravated sexual abuse. *See* 18 U.S.C. § 242; *United States v. Lanier*, 520 U.S. 259, 264 (1997) (citing *Screws v. United States*, 325 U.S. 91 (1945)); *United States v. Dukes*, 779 F. App'x 332, 334 (6th Cir. 2019).

A. <u>First Element: Color of Law</u>

A person acts under "color of law" when he acts in his official capacity, or by virtue of the power conferred to him by the state. *See Screws*, 325 U.S. at 111; *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001) (holding that an officer acts under color of law if his "conduct occurs in the course of performing an actual or apparent duty of his office or . . . [his] conduct is such that the actor would not have behaved as he did without the authority of his office."). To determine whether a defendant is acting under color of law, "[t]he fact that a police officer is on or off duty, or in or out of uniform is not controlling. It is the nature of the act performed, not the

---

trial. *See* Doc. 51.

clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law." *Morris v. City of Detroit, Michigan*, 789 F. App'x 516, 518 (6th Cir. 2019) (internal citations and quotations omitted). The Sixth Circuit considers "certain factors when deciding whether an officer was acting under color of state law, such as whether the officer flashed a badge, identified himself as a police officer, placed an individual under arrest, intervened in a dispute between third parties pursuant to a duty imposed by police-department regulations or used state-issued equipment." *Id.* at 518 (internal citations omitted).

The Government anticipates that the evidence at trial will show that the Defendant acted under color of law. MPD records confirm that the Defendant was on-duty and working in his capacity as an MPD officer when he arrived at K.T.'s home to investigate her domestic incident call and her report of vandalism to her car. The Defendant left K.T.'s home after taking the initial report and the Defendant told K.T. that he would be back with a camera to photograph the damage to her car. When the Defendant went back to K.T.'s home, he was ultimately allowed in because she recognized him as the officer who told her that he was coming back pursuant to his official duties to photograph the damage to her car. The Defendant was wearing a shirt with "Police" written on it. Once the Defendant gained access to K.T.'s home under the guise of following up on MPD's vandalism investigation, he sexually assaulted her at gunpoint. With this evidence, the Government will establish beyond a reasonable doubt that the Defendant acted under color of law. *See*, *e.g.*, *Cates v. United States*, 882 F.3d 731, 737 (7th Cir. 2018) (discussing a § 242 case in which the officer-defendant gained access to the victim's home because he responded to a 911 call and found reasons to stay at the victim's home for an extended period without other officers); *United States v. Morris*, 494 F. App'x 574, 576 (6th Cir. 2012) (discussing a § 242 case in which

the officer-defendant identified his victim as a result of a traffic stop, told her to drive to a remote area, and sexually assaulted her).

      B.      <u>Second Element: Deprivation of Rights</u>

Sexual assault by a police officer acting under color of law violates a victim's Fourteenth Amendment substantive due process right to bodily integrity. *See Morris*, 494 F. App'x at 580; *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 364 (6th Cir. 2005) ("The Due Process clause of the Constitution protects individuals against state intrusions on bodily security. . . . That right embraces the right to be from sexual abuse at the hands" of state employees); *Morris*, 494 F. App'x at 580 (affirming a deputy's § 242 conviction for raping a woman after a traffic stop). To prove a violation of the Fourteenth Amendment due process right to bodily integrity, the Government must prove that the defendant's conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The Sixth Circuit has held that "it is more than obvious that the right to not be raped by a law enforcement officer lies at the core of the rights protected by the Due Process Clause." *Morris*, 494 F. App'x at 581. As part of establishing a violation, the Government must also prove that the victim did not consent to the sexual acts. *United States v. Cobenais*, 868 F.3d 731, 739 (8th Cir. 2017) (upholding jury instruction that states, "There is no consent if the sexual act was accomplished against the will of [the victim] by the use of force, coercion, or threats. Consent may be verbal or implied based on the facts, circumstances, and evidence presented to you."); *see also Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("Consent that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer

to refuse.").

The Government will prove beyond a reasonable doubt that the Defendant deprived K.T. of her right to bodily integrity. The Defendant's conduct unquestionably shocks the conscience. The Defendant responded to K.T.'s report of a domestic incident, and instead of ensuring K.T.'s safety and carrying out his official duties to her as a crime victim, he sexually assaulted her. The Government will further establish that K.T. did not consent when the Defendant pointed a gun at her, violently dragged her into a bedroom, forced her legs open, and sexually assaulted her while pointing his gun at her chin.

As evidenced by his defense in his state trial, and as necessitated by the DNA evidence proving his identity, the Defendant will probably attempt to present a consent defense, arguing that K.T. consented to the encounter. K.T.'s testimony regarding the Defendant's forceful, violent, and threatening conduct during the assault, corroborated by multiple outcry witnesses and medical records documenting her injuries, will rebut that defense. Relatedly, and as discussed in more detail below, the Defendant may claim that K.T.'s allegations are false, and the Government will seek to introduce K.T.'s prior consistent statements to rebut a claim of recent fabrication under FRE 801(d)(1)(b). *See* Doc. 48.

    C.    <u>Third Element: Willfulness</u>

A "willful act" for purposes of § 242 is one committed either "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." *Screws*, 325 U.S. at 105. Here, willfulness can be inferred from the egregious nature of the conduct: sexually assaulting a woman under color of law is so obviously wrong to establish that the Defendant undoubtedly knew it was wrong. *Morris*, 494 F. App'x at 581 (holding that "knowledge

of a comprehensive law library is unnecessary for officers of the law to know" that raping a victim is wrong). Not only that, but there is additional evidence that demonstrates that the Defendant acted willfully. The Defendant told K.T. that he needed to get a camera to photograph the damage to her car and went back to her apartment in the early morning hours alone. He knew he could not assault K.T. with another officer present, and he relied on her vulnerability and exploited her apparent trust in law enforcement and willingness to cooperate in the vandalism investigation in order to gain access to her home and sexually assault her while threatening her with a gun.

We expect that the Defendant will not directly contest willfulness, instead arguing that the encounter was consensual. However, based on the above-mentioned evidence, the Government will meet its burden with respect to this element beyond a reasonable doubt.

### D.     Fourth Element: Aggravated Sexual Abuse

A defendant commits "aggravated sexual abuse" "by knowingly caus[ing] another person to engage in a sexual act (1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping; or attempting to do so[.]" *See* 18 U.S.C. § 2241(a); *Cates*, 882 F.3d at 737 ("We long ago held that the term 'force' in § 2241(a)(1) means physical force," as applied in a § 242 sexual assault prosecution.) (internal citations omitted); *see also United States v. Shaw*, 891 F.3d 441, 448 (3d Cir. 2018) (force "may be satisfied by a showing of . . . the use of such physical force as is sufficient to overcome, restrain, or injure a person.").

While the Government need only prove one of these factors beyond a reasonable doubt in order to satisfy this element, it will establish beyond a reasonable doubt that the Defendant committed aggravated sexual abuse as defined under both § 2241(a) and (b). K.T. will testify that

the Defendant used physical force multiple times during the sexual assault, including (1) dragging K.T. to the bedroom, causing her to hit her head on a doorframe and injuring her arm and knee; (2) forcing K.T.'s legs open; and (3) forcing his penis into her as she pushed against his chest. *See* 18 U.S.C. § 2241(a). Further, K.T. will testify that the Defendant placed her in fear that she or her daughter would "be subjected to death, serious bodily injury, or kidnapping" by pointing his gun at her throughout the assault, and by threatening her daughter before the assault. *See* 18 U.S.C. § 2241(a)(2).

### IV. ANTICIPATED EVIDENTIARY ISSUES

The Government submits the following evidentiary matters for the benefit of the Court in anticipation that they may arise at trial. Separately, the Government has motions *in limine* regarding the admissibility of (1) sworn testimony from a now-deceased chain of custody witness, *see* Doc. 45; (2) K.T.'s outcry statements and statements to medical providers, *see* Doc. 48; and (3) Rule 413 evidence regarding the Defendant's sexual assault of a second victim, N.J., only a year after the charged assault, *see* Doc. 50. The Government also filed motion *in limine* seeking exclusion of (1) argument regarding equally available witnesses, *see* Doc. 46; (2) improper evidence regarding the Defendant's character, *see* Doc. 47; (3) nullification evidence and argument related to the age of the case, *see* Doc. 49; and (4) evidence or argument about the Defendant's acquittal on state charges, *see* Doc. 51.

    A.    <u>Impeachment Using FBI 302s and Prior Statements to Police</u>

Some of the Government's witnesses have made multiple unsworn statements that were not recorded or memorialized verbatim, including statements made (1) to MPD during the initial investigation in 2000; (2) to MPD in 2014 after K.T.'s sexual assault kit was tested; and (3) to

federal investigators.[5] Federal law enforcement agents interviewed several witnesses in this case, and those agents summarized the interviews in reports and FBI FD-302s. Those summaries are not statements of the witnesses; they are the interviewing agent's statement, and accordingly they cannot be admitted to impeach a witness. *See United States v. Nathan*, 816 F.2d 230, 236 (6th Cir. 1987) (holding that FBI 302s and FBI agent notes may not be used to impeach interviewees because "it would be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own"); *see also United States v. Lundergan*, No. 518CR00106GFVTMAS, 2019 WL 4061667, at *3 n.1 (E.D. Ky. Aug. 28, 2019) ("A 302 report is typically inadmissible as hearsay evidence, as those reports memorialize an investigator's selections, interpretations, and interpolations, rather than the witness's verbatim statements.") (internal quotation marks omitted); *United States v. Sampson*, 898 F.3d 287, 308–09 (2d Cir. 2018) (holding that FBI agent notes were inadmissible hearsay and that proper way to address their contents is by calling the agent). Accordingly, while the defense may ask a witness about a prior statement to the FBI, they may not admit the 302 as extrinsic evidence of the witness's prior inconsistent statement pursuant to FRE 613(b). The proper way to perfect the impeachment is to instead call the agent and ask about the content of the witness's statement. The same principle applies to the use of police reports documenting witness statements to MPD officers. *See United States v. Severson*, F.3d 1424, 1427 (7th Cir. 1993) (explaining that a third party's characterization

---

[5] Some of the Government's witnesses testified under oath during the Defendant's 2018 state trial. Those statements are not hearsay and can be used to impeach the Government's witnesses at trial pursuant to FRE 801(d)(1)(A). *See* Fed. R. Evid. 801(d)(1)(A) ("A statement that meets the following condition[] is not hearsay: The declarant testifies and is subject to cross-examination about a prior statement, and the statement is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition.").

of a statement is not the same as an actual prior statement, unless the witness subscribed to that characterization); *United States v. Burton*, 387 F. App'x. 635, 638 (7th Cir. 2010) (same); *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993) (same).

### B. Chain of Custody for DNA Evidence

The Defendant has indicated that he does not intend to stipulate to chain of custody regarding the DNA evidence recovered from the sexual assault kit in K.T.'s case. Unsurprisingly, given the age of this case, two witnesses in the MPD chain of custody for the DNA evidence in K.T.'s case are now deceased. Those gaps in the chain of custody do not render the DNA evidence inadmissible, because "chain of custody issues are jury questions and the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility." *United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010); *see also United States v. Briggs*, 431 F. App'x 389, 393 (6th Cir. 2011).

Furthermore, because one of those witnesses testified in the state court trial, their prior sworn testimony is admissible in the federal trial for proving chain of custody. *See* Fed. R. Evid. 804(a)(4), (b)(1)(A)–(B) (allowing admission of prior sworn testimony of an unavailable declarant where the testimony is offered against a party which had "an opportunity and similar motive to develop it by . . . cross"). Here, the Defendant was tried with an offense rooted in the same conduct and had a similar incentive to challenge the chain of custody in the state case. Therefore, this witness' prior testimony should be admissible at trial.[6]

### V. CONCLUSION

---

[6] The Government filed a motion *in limine* seeking introduction of this witnesses' testimony from the Defendant's state trial. (Doc. 45).

Accordingly, the United States respectfully submits this trial brief.

        Very truly yours,

        KEVIN G. RITZ
        UNITED STATES ATTORNEY

        s/ David Pritchard
        David N. Pritchard
        Assistant United States Attorney
        167 North Main, Suite 800
        Memphis, Tennessee 38103
        (901) 544-4231
        (Tennessee, BPR No. 018187)

        KRISTEN CLARKE
        ASSISTANT ATTORNEY GENERAL

By:   s/Maura White
       MAURA WHITE
       Trial Attorney
       U.S. Dept. of Justice
       Civil Rights Division, Criminal Section
       950 Pennsylvania Ave, NW, 4CON
       Washington, DC 20530
       (202) 532-3827

By:   s/Andrew Manns
       ANDREW MANNS
       Trial Attorney
       U.S. Dept. of Justice
       Civil Rights Division, Criminal Section
       950 Pennsylvania Ave, NW, 4CON
       Washington, DC 20530
       (202) 598-1581

cc:    Clerk of the Court (W.D. Tenn.)

## CERTIFICATE OF SERVICE

I, Andrew Manns, hereby certify that on the date below, I electronically filed the foregoing with the Clerk of Court for the Western District of Tennessee via the Electronic File System which sent notification of said filing to: Leslie Ballin.

s/ Maura White
MAURA WHITE
January 27, 2023

s/ Andrew Manns
ANDREW MANNS
January 27, 2023
